## Chicago Telephone Company v. Illinois Manufacturers' Association et al.

1. EQUITY PRACTICE—*Bill is Not Multifarious Because Brought for Distinct Claims Arising from a Common Cause.*—A bill is not multifarious which presents separate claims and causes of action which are all against the defendant and arise from a common cause, involve similar facts, are all governed by the same legal principles, and which are all based upon a single city ordinance. Such common right of all the complainants, as above stated, enables them to join in one bill. It prevents a multiplicity of suits, which is a general ground of equity jurisdiction.

2. SAME—*When Objection that Bill is Multifarious Comes Too Late.*—The weight of authority is that the objection as for multifariousness comes too late, if first presented by the answer; the objection is waived unless presented by demurrer and before answer, when the multifariousness appears upon the face of the bill, or by plea, if the objection does not appear from the bill.

3. WORDS AND PHRASES—" *Telephone Service.*"—The words ": telephone service" mean a service by an organized apparatus as an entirety, and whatever change might be made therein by the addition of wires, apparatus or appliances, for the purpose of improving or rendering it more efficient.

4. ORDINANCES—*Wrong Construction is Not Binding.*—A prior wrong construction of an ordinance is not binding upon the city.

5. TELEPHONE COMPANIES—*Must Serve All Patrons Alike.*—A tele-

phone company is bound from the public character of its business—it is a common carrier of speech through its telephone systems—to serve all its patrons alike, to furnish them telephone service, with all its improvements, which have been adopted and used by it, for the rates fixed by the city ordinance.  A public service corporation must perform its service to the public as required by the municipal regulations under which the corporation is granted its privileges, and can not escape under the guise of a contract that is in part illegal, because of a violation of such regulations.

**Bill for an Injunction.**—Appeal from the Circuit Court of Cook County; the Hon. MURRAY F. TULEY, Judge presiding.  Heard in this court at the March term, 1902.  Affirmed.  Opinion filed February 9, 1903.

HOLT, WHEELER & SIDLEY, attorneys for appellant; JOHN J. HERRICK, of counsel.

MORAN, MAYER & MEYER, attorneys for Illinois Manufacturing Association et al, appellees.

CHARLES M. WALKER, corporation counsel, and HENRY SCHOFIELD, assistant corporation counsel, attorneys for the City of Chicago, appellee.

MR. JUSTICE WINDES delivered the opinion of the court.

The Illinois Manufacturers' Association, a corporation of this state, and twenty-nine other persons, firms and corporations, filed a bill October 2, 1901, in their own behalf and of all other lessees of and subscribers for telephone instruments, equipments and telephone service of the Chicago Telephone Company, similarly situated, for the purpose of enjoining the latter company from exacting of complainants and others similarly situated a greater rate than $125 per year for telephone service, as fixed by the terms of a certain city ordinance and schedule of telephone rates set up in the bill, from removing their telephone appliances and apparatus from complainants' places of business, respectively, and from cutting off their telephone service, and for a decree declaring void a clause in complainants' telephone leases from the Telephone Company, which required them to pay $175 annually for a telephone service and connection,

56    APPELLATE COURTS OF ILLINOIS.

VOL. 106.]    Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

in so far as regards an excess of $50 above the rate fixed for the same by the terms of said ordinance and schedule.

After filing the bill the names of certain of the original complainants were stricken therefrom on motion of their solicitors, and others were made co-complainants, pursuant to petition filed by them, and at the time of the granting of the injunction, as hereinafter stated, there were in all seventy-seven complainants.

On the motion, supported by the sworn bill of complaint, certain affidavits and documentary evidence, to which was opposed the sworn answer of the defendant, certain affidavits and documentary evidence, the chancellor on January 25, 1902, granted an injunction until the final hearing of the cause, substantially as prayed, to reverse which this interlocutory appeal was taken.

Because of the great length of the pleadings and evidence, it would unduly extend this opinion to state them, and we will therefore only make such reference thereto as seems necessary in disposing of the principal questions presented.

Near the end of the defendant's answer, which covers sixty-nine typewritten pages of the record, there is a clause which states in substance that the bill is multifarious, for the reason that it is brought by several complainants for distinct matters and causes, and prays the same benefit of this defense as if the defendant had demurred. It is strenuously argued that the bill is multifarious, and therefore that the injunction should not have been issued. We can not assent to this claim.

It is true that in a sense the bill does present separate claims and causes of action, but it is also true that such claims and causes of action are all against the defendant and arise from a common cause, involve similar facts, and are all governed by the same legal principles. While it appears from the bill that each of the complainants, by virtue of a separate lease or contract, procured telephone service at different dates, running over a period of some six years, from the defendant, and it is alleged, in substance, that each

of the complainants was compelled to take such leases because of their several business necessities, and by reason of the defendant having a monopoly of the telephone business in Chicago, it also appears that the right of all the complainants, if any they have, is based upon an ordinance of the city of Chicago and schedule of rates for telephone service set out in the bill, which fixes the rates for telephone service which the defendant is allowed to charge within a certain district within the city of Chicago, within which all the complainants' telephones are situated. This being true, we are of opinion that the fact that the complainants' claims are to a degree separate and distinct, does not make the bill altogether multifarious, and that the common right of all the complainants, as above stated, enables them to join in one bill. It prevents a great multiplicity of suits, as is apparent from allegations of the bill, which is a general ground of equity jurisdiction. City of Chicago v. Collins, 175 Ill. 445–51; German A. Ins. Co. v. Van Cleave, 191 Ill. 410.

In the first case cited, a bill by 373 residents and taxpayers of Chicago to enjoin the enforcement of a void ordinance of the city providing for a license of all vehicles used upon its streets, was sustained on the grounds that it prevented a multiplicity of suits, that the complainants had a common cause which involved similar facts, and that the same legal rule applied. The objection of multifariousness was not made in the case—only that the complainants had a remedy at law; but we think the principle announced has application to the question here presented.

In the Van Cleave case, *supra*, a bill by forty-two insurance corporations to compel the insurance superintendent of the state to refund a tax paid by them, under protest, upon unearned and return premiums, and for an injunction to prevent the collection of any further tax in that regard, was sustained. It appears that the insurance superintendent made demand on each of the complainants to pay this tax, and threatened to revoke their authority to do business in the state unless they complied with his demands, and that they paid the several amounts so demanded under

58    APPELLATE COURTS OF ILLINOIS.

VOL. 106.]    Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

protest. This would necessarily show a separate and distinct claim by each of the complainants. It was objected that each of the complainants had an adequate remedy at law by a suit against the insurance superintendent to recover the amount so paid by each, but the court held that the bill was a proper appeal to equity, and among other things say: "While the demand is separate in each case, the rights of the parties depend upon the same facts. Complete relief may be furnished by a decree determining the single question, applicable to all, and in which all are interested." This language is peculiarly in point in this case, and while it was used with reference to an objection that there was a remedy at law, we think the principle announced applies to the objection of multifariousness.

Especial reliance seems to be placed by appellant's counsel upon the case of Crawford-Adsit Co. v. Fordyce, 100 Ill. App. 362, decided by the Branch Appellate Court; but we think the case is materially different from this one, and not controlling. The court there held that the claims sought to be joined were in their nature separate, and had no relation or dependence upon each other; that the "interest of each is several and distinct; relief granted to one will be of no benefit to another;" also that the complainants had a plain, full and adequate remedy at law.

Moreover, many authorities hold that although the question of multifariousness may not be raised by the parties, the court may, at any time, raise the question and dismiss the bill where the form of the bill, because of multifariousness, is such that it will embarrass the court in the administration of justice. That was what was done in the case last cited.

Even if, strictly speaking, the bill is multifarious, we think the better practice, and that most in accord with reason and equity, is that the objection as for multifariousness comes too late, if first presented by the answer. The authorities do not seem to be harmonious, and many are to the effect that this objection to a bill may be presented by plea or answer, but we think the weight of authority, as

well as the better reason, is that the objection is waived unless presented by demurrer and before answer, when the multifariousness appears upon the face of the bill, or by plea, if the objection does not appear from the bill. Story's Equity Pldgs., Secs. 271a, 284a, 533, 544; 1st Daniel's Ch. Pl. & Pr., Sec. 346; Harward v. St. Clair Drain. Co., 51 Ill. 130-8; R. R. Co. v. Blanchard, 54 Ill. 240-3; Labadie v. Hewitt, 85 Ill. 341-3; Annin v. Annin, 24 N. J. Eq. 184; Nelson v. Hill, 5 Howard (U. S.) 127; Darcey v. Lake, 46 Miss. 109-15; Payne v. Avery, 21 Mich. 524-38; Trustees, etc., v. Cowen, 4 Paige, 510-15; Boyd v. Hoyt, 5 Paige, 65-79, and note.

It may also be observed that the principal objections urged to this bill as for multifariousness, viz., that the trial of the case would necessitate the consideration of many matters distinct and separate, because of the separate leases and the divers dates at which they were taken and the necessities of the business of each complainant, may be eliminated. This is so for the reason that the facts set up in the bill, which are similar in their nature and apply to all of the complainants alike, are such, the bill praying, as it does, for general relief, as would justify the court in granting to the complainants, under the general prayer, relief which would give them the right to telephone service at the ordinance rate, by what is referred to in the bill as the metallic circuit service. This relief may be granted without any reference to the several contracts of the complainants, because they are entitled to it under the provisions of the ordinance and the evidence in the record, to which more specific reference will be made.

The questions presented on the merits of this appeal arise upon the construction of the city ordinance referred to in the bill, which was passed January 4, 1889, by virtue of which and its charter the defendant, an Illinois corporation, is doing a telephone business in Chicago, as well as in the county of Cook outside of Chicago and surrounding counties, and in territory near said city in Indiana and Wisconsin—in the latter state as far away as the city of Mil-

60       APPELLATE COURTS OF ILLINOIS.

VOL. 106.]     Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

waukee.    The first five sections of this ordinance give the
defendant the right to construct and operate in the streets
and public ways of Chicago its lines of wires for telephone
purposes, for a period of twenty years, and prescribe when
and how they shall be placed.    Section 6, which is a part
of the ordinance directly in question, provides in substance
for semi-annual statements by the company of gross receipts
for its telephone business within the city, and that it should
pay to the city three per cent thereof during the term for
which the ordinance is granted, and further that the com-
pany "shall not increase to its present or future subscribers
the rates for telephone service now established.    And pro-
vided, also, that with the acceptance hereinafter required
there shall be filed by said company a schedule showing the
rates charged by said company for telephone service at the
date of the passage of this ordinance, within the limits of
the city of Chicago;" also, that certain telephones should
be furnished in different city offices specified, free of charge,
and that the company would rent telephones to the city for
its police and fire alarm system at an annual rental of not
to exceed $5 for each 'phone, and has a provision that the
ordinance shall not prevent the city from regulating tele-
phone rates by ordinance nor from licensing telephone com-
panies, and that the city should not be prevented from
granting an ordinance to any other telephone company.
The remaining sections provide for the giving of a bond by
the company, for acceptance of the ordinance, and other
matters not material.

The schedule referred to in the part of the section above
quoted was filed January 8, 1889, and in so far as material,
is as follows:  .

" Within the blue lines on the map of Chicago attached
hereto and made a part hereof, we charge one hundred and
twenty-five ($125) dollars per annum for telephone instru-
ments connected by wire with our exchange for the busi-
ness use of the lessee and his employes alone."

The map referred to in the schedule is in the record, and
the blue lines on it embrace a large part of the territory

within the then limits of Chicago, but no question is made as to these limits.   After the filing of the schedule on January 10, 1889, the defendant accepted the ordinance and executed a bond to the city as required thereby.   At the time of the passage of this ordinance the defendant had, by consent of the city, been engaged in the telephone business in the city and its suburbs for a number of years.   Since its passage the business of the company has increased to very large proportions, has become a monopoly within the city, and at the time of the filing of the bill the company had over 45,000 telephones in operation; in the year 1900 its gross earnings exceeded $3,000,000, and its net earnings for the same year exceeded $800,000, and for a number of years prior to the filing of the bill it had paid an annual dividend to its stockholders of over twelve per cent per annum.

It also appears that the complainants from time to time, commencing as far back as the year 1893, by reason of the necessities of their several businesses, because the defendant had a practical monopoly of the telephone business in the city of Chicago, and also because, as they claim, the old telephone service in use at the time of the passage of the ordinance, referred to in the record and briefs as the *grounded line service*, had become entirely inefficient and unsatisfactory, severally entered into contracts with the defendant by which they agreed to pay $175 annually, and the defendant agreed to furnish them with telephone service, including instruments and equipment, as follows: " One long distance transmitter, one long distance battery, one hand telephone and one ringing set," all to be connected by a copper metallic circuit with the defendant's Chicago Telephone Exchange and all other lessees connected with said exchange.   This service is referred to in the record and briefs as the *metallic circuit service*, and provides for toll line and long distance service for extra pay.

The complainant, the city of Chicago, entered into quite a number of like contracts, and at the same time, during quite a number of years, extending up to the filing of the

62    APPELLATE COURTS OF ILLINOIS.

VOL. 106.]    Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

bill, also had contracts with the defendant for and used its telephone service, known as the *grounded line service*, agreeing to pay therefor the sum of $125 annually. This latter service was the one in use at the passage of the ordinance, and under the contracts for it defendant agreed to furnish to its patrons " One magneto bell, one hand telephone and one Blake transmitter," all to be connected by a grounded line with defendant's Chicago Exchange. Under this service defendant also gives the toll line service for extra pay, but not long distance service.

The initial question in construing that part of section 6 quoted, is as to whether it prevents the defendant from increasing its rates for telephone service generally during the term of the ordinance, or from increasing its rates for that kind of telephone service which it furnished at the time of its acceptance of the ordinance.

The words to be construed are, " The rates for telephone service now established." Appellant's counsel say that the words " now established " qualify the words " telephone service," and appellees' counsel contend that these words qualify the word " rates." And for appellant it is said that if the words " now established " qualify the word " rates," they also qualify the words " telephone service " as well, and that the clause should therefore be read as if it said, " the rates now established for telephone service now established." It is conceded by both counsel that the language in question should be read and construed in the light of the surrounding facts and existing conditions at the time the ordinance was passed. This is right. When the language is read in this view, we are of opinion that the words " now established " are intended to apply to and qualify the word " rates." It appears from the record, and besides it was well and generally known when the ordinance was passed, that the telephone art was, comparatively speaking, in its infancy. Very many radical and important improvements have since been made in it, by which telephone service has been rendered more efficient and satisfactory. Electricity was not then in use in Chi-

cago for street cars, nor to any considerable extent for lighting, and there was in 1889 no material interference with telephone service by the multiplication of electric wires and other conductors of electricity. The ordinance does not undertake to describe what the telephone service to be furnished by the defendant should be nor what appliances or apparatus should be furnished therefor. The schedule of rates which was filed by the defendant and became a part of the ordinance, showed what was then charged by the company for telephone service, and it does not appear that it applied to any particular service, though the only service then furnished by the company was the grounded line service, with the apparatus and appliances which have been mentioned as connected with that service. It is true, the metallic circuit service was not at that time in use in Chicago, and it was not used, as appears from the evidence, for commercial purposes generally, until some years later, about the year 1893. The metallic circuit service, as the evidence shows, is but an improvement of telephone service over the grounded line service. The latter service, as we think appears from the preponderance of the evidence, became inefficient and unsatisfactory, and it became necessary to replace it by some means. The metallic circuit service resulted from this necessity. We think that the reasonable construction of the language in question is, that it was intended thereby that the defendant should not, during the term of the ordinance, increase its rates, which it was, when the ordinance was passed, charging for telephone service. And by telephone service there was intended not only the particular service then being rendered, but as well any improved telephone service which the company might thereafter adopt and put in use, whatever might be the appliances and instruments used to improve and make it more efficient and satisfactory than the service in use January 10, 1889. If, as is contended by the learned counsel for appellant, the rates fixed by the ordinance were intended to apply only to the telephone service then established, and in use when the ordinance was

64　　·　APPELLATE COURTS OF ILLINOIS.

VOL. 106.]　　Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

passed, it would follow that any improvement in the art which made necessary the addition of another wire, or any different instrument or appliance to use such improvement, if the company adopted and used such improvement, would allow the company, when it furnished a patron such instrument or appliance, to charge a rate without limitation. Such a construction, as it seems to us, would be unreasonable and could not have been intended by the language used.

In the opinion of the learned chancellor who granted the injunction in this case, a purported copy of which is an appendix to appellees' brief, and to which frequent reference is made in the brief of appellant's counsel, especial reliance is had on certain decisions made by the Supreme Court of Indiana, and we think rightly so. In one of these cases, Hockett v. The State, 105 Ind. 250–61, the court had under consideration a statute of that state which provided that no telephone company in the state "shall be allowed to charge, collect or receive as rental for the use of such telephones, a sum exceeding $3 per month, where one telephone only is rented by one individual, company or corporation." The case seems to have been very fully and carefully considered, and the court sustained a judgment of the trial court inflicting a fine imposed by the latter court for a violation of the statute, which provided a penalty therefor. Among other things, the court says, in speaking of the meaning of the word "telephone" and how it is understood, "The word telephone constitutes a generic term, having reference generally to the art of telephony as an institution, but more particularly to the apparatus as an entirety, ordinarily used in the transmission, as well as in the reception of telephonic messages;" also, that the meaning of the word, as generally accepted, was an "organized apparatus—an institution—and not a single instrument."

To a like effect in principle and affirming the previous case, are Telephone Co. v. Bradbury, 106 Ind. 1–9; Johnson v. The State, 113 Ind. 143, and Telephone Co. v. The State, 118 Ind. 194–206. Under the authority of these cases it would seem clear that the words "telephone service"

mean a service by an organized apparatus as an entirety, and whatever change might be made therein by the addition of wires, apparatus or appliances, for the purpose of improving or rendering it more efficient, it was still telephone service, and as much within the meaning of the ordinance after the changes as before.

It is, however, claimed that the appellees, and particularly the city of Chicago, have, by their acts and the contracts for telephone service which they made from time to time, extending over a period of years, given a practical construction to the ordinance in line with appellant's contention, which construction is binding upon them. In our opinion there are three answers to this claim, viz.: First, that in so far as the complainants, except the city, are concerned, there is no evidence which, as it seems to us, shows that they put any construction whatever upon the ordinance, but they made the contracts they did without any reference to the rates fixed by the ordinance, because of the necessities of their business, and the fact that the defendant had a monopoly of the telephone business. As to the city of Chicago, any construction by it of the ordinance, in its private capacity as the user of telephones under its contracts with the defendant, would have no binding effect upon the complainants or the public generally. And, second, notwithstanding any construction of the ordinance by the city, if it was a wrong construction, it would not be bound thereby, nor would the public. Harrison v. People, 195 Ill. 466–73; People v. Village of Crotty, 93 Ill. 180–90.

In the case last cited, which was an application to compel the issuance of a dram-shop and pool-table license, it was, among other things, claimed that the license should have been issued because the municipal authorities had issued licenses to others under the same circumstances, and that the refusal to issue the particular license was placed upon an improper ground. The court say:

"The fact that appellee may have issued improper licenses to others by reason of a want of authority to do so, could

66    APPELLATE COURTS OF ILLINOIS.

VOL. 106.]    Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

afford no possible reason why it should issue them to appellant, and if appellee had no right to issue them it is immaterial upon what ground it placed its refusal."

In the Harrison case, *supra*, which was a proceeding by mandamus against the mayor of the city of Chicago to compel the issuance of a saloon license to the relator, pursuant to an ordinance for licensing saloons, the question of practical construction of the ordinance arose. It was claimed that because the city council had previously construed the ordinance according to the contention of the relator, the city was bound by such construction, and although that construction of the ordinance was held to be the correct one by the trial court, and a majority of this court, and by the minority a doubtful construction (Harrison v. The People, 97 Ill. App. 421), the Supreme Court gave the ordinance a different construction, and held that the previous construction of the ordinance by the city, extending over a period of many years, in the manner contended for by the relator, was not binding upon the city. We are therefore of opinion that any prior construction of the ordinance by the city does not aid the defendant.

And third, notwithstanding the complainants' contracts, defendant, being a public service corporation, is bound by the ordinance to furnish all persons alike with telephone service, within the district named in the schedule, at the ordinance rates—$125 per year. The ordinance is plain in its provisions, and although complainants have, without protest and voluntarily, except for their business necessities and defendant's monopoly, made contracts to pay a higher rate than the ordinance permits the defendant to charge, that excess is illegal, and under the authority of Inter Ocean Co. v. Associated Press, 184 Ill. 438, is an illegal exaction, void, and may be stricken from the contract. In the case cited, the complainant, the Inter Ocean Co., knowingly and voluntarily entered into a contract with the Associated Press, a corporation, by which the latter agreed to furnish the former with local and telegraphic news for a certain price and other considerations, among them a

clause in the contract which restricted the Inter Ocean Co. from obtaining news from other sources than the Associated Press. The court held this clause of the contract illegal and void, as being a "restriction upon the trade and business among the citizens of a common country;" that the business of the Associated Press, namely, selling news reports to newspapers, was impressed with a public interest; that the corporation should furnish its news reports alike to all; that the contract was the same as if it did not contain the illegal clause; that the illegal clause should be stricken out, and the remainder of the contract as made enforced. The court, among other things, say:

"The legal character of the corporation and its duties can not be disregarded because of any stipulation incorporated in a contract that it should not be liable to discharge a public duty. Its obligation to serve the public is not one resting on contract, but grows out of the fact that it is in the discharge of a public duty or a private duty which has been so conducted that a public interest has attached thereto."

The questions decided are similar to those presented here, and the principle announced seems controlling in this case. The defendant is bound, from the public character of its business—it is a common carrier of speech through its telephone system—to serve all its patrons alike, to furnish them telephone service, with all its improvements, which have been adopted and used by it, for the rates fixed by the city ordinance. This is its public duty, which it can not disregard nor escape by contracts which require its patrons to pay for the performance of that duty an amount in excess of what may be charged under the ordinance.

To the same effect in principle is People v. R. R. Co., 178 Ill. 594, though the case is *mandamus*. The controlling principle of these cases is that a public service corporation must perform its service to the public as required by the municipal regulations under which the corporation is granted its privileges, and can not escape under the guise of a contract that is in part illegal, because of a violation of such regulations.

68    APPELLATE COURTS OF ILLINOIS.

VOL. 106.]    Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

Appellant's counsel, with great earnestness and ability, argue that the metallic circuit service furnished to appellees under their several contracts, by virtue of which they get not only toll line service to points outside the city of Chicago, in Cook county and in adjoining counties, and to the points in Indiana and Wisconsin referred to, which, however, was given when the ordinance was passed and is now given under the grounded line service for extra pay or tolls, but also a long distance service, under which appellees are enabled to communicate by telephone with all the large cities and very many smaller cities of the United States, more than 26,000 in number, is a totally new and different telephone service from what was furnished by the defendant at the time of the passage of the ordinance, when only the grounded line service was in use; also that because the former or combined service necessitated the use of different instruments, wires, equipments and appliances, that it was in no way covered by the ordinance, and the defendant was not bound to furnish this special equipment and service, and consequently was entirely at liberty to contract at special rates therefor, as it had done. This claim is the very basis of the appellant's case, but we can not, after the most careful consideration, yield assent thereto.

It appears from the opinion of the chancellor, given on the motion for injunction, that he had reached the conclusion, in substance, that the metallic circuit service, by reason of changed conditions, and the inefficiency and unsatisfactory nature of the grounded line service, had become a matter of necessity, not only to overcome the difficulties of using the grounded line service, but also to increase the demand for the defendant's telephones, and that the defendant had adopted and put in use the metallic circuit service in its own financial interest and for its own advantage.

There is much evidence in the record tending to sustain the claim of appellant's counsel, but the other evidence in the case, in our opinion, justifies the conclusions of the chancellor. At least it may be said that the chancellor

was not clearly in error in this regard. This being the state of the record, very many decisions of this and the Supreme Court make it our duty to sustain the chancellor. In this regard the chancellor, among other things, says :

"It clearly appears that the grounded line telephone service, as it existed in 1889, gradually became more and more inefficient and unsatisfactory. This was caused by the introduction of wires for electric lighting and railway service, and the steadily increasing multiplication of iron pipes and conductors of electricity being placed in and over the streets and alleys of the city of Chicago.  *  *  * The telephone service in existence at the passage of the ordinance, for the causes aforesaid, demanded that some changes and improvements be made. It became impracticable to continue the use of the iron wire and grounded circuit in the most central part of the city, and for that reason, among others, it became necessary to substitute in places the copper wire for the iron, and at certain points to have return trunk wires, so as to relieve the service from the many disturbances arising from the growth and increasing use of the streets for public and *quasi*-public purposes, by other corporations and individuals.

"The defendant's answer in connection with the evidence clearly shows the inadequacy and inefficiency of the old service for the changed condition of affairs. The improvements which the answer alleges were made in the old or grounded service by the defendant, and for which it appears the defendant made no extra charges to subscribers, must be held to have been made to advance its own interests as well as in the performance of its duty to give telephone service at the rate of $125 per annum.  *  *  * All the improvements adopted in the service, under the special service contract, ' Exhibit B,' except the long distance connection, are practically of the same nature as the improvement in the old or grounded line service, and no reason can be perceived why the improvements in the latter service should be made and given free of charge, and those of the former or special service should be made the subject of additional charges. They were all demanded by the necessities of the situation, the changed conditions, the growing inefficiency of the service, and were demanded not only to overcome new difficulties, but also to increase the demand for telephones. It also clearly appears from the evidence that all these improvements in the service were

70        APPELLATE COURTS OF ILLINOIS.

VOL. 106.]   Chicago Telephone Co. v. Illinois Mfrs. Ass'n.

not only demanded for the satisfactory service to subscribers, but also that they were made by the Telephone Company in its own financial interest and for its own advantage. In my opinion, from the evidence, substantially all of these improvements in instruments and in improved service rendered by the company under the special contract, 'Exhibit B,' would have been made had the long distance telephone never reached the city of Chicago. * * * That the grounded line service was steadily becoming more and more inefficient and unsatisfactory, and that the defendant found it to the interest of the company to encourage the damands for more efficient and satisfactory service is conclusively shown by the annual reports of the directors and official documents issued by the company, which have been introduced in evidence. * * * The service of 1889 was not confined to the city of Chicago, but extended to many toll stations with which the defendant company was connected and to be connected. By connecting the subscriber with an out-of-town toll station at a neighboring village, the subscribers could talk with a resident of a village over some other company's line, which furnished telephone service in that, or with some other village, but the service over the other line was an extra charge on the subscriber. The relation of the parties to the long distance is precisely the same as existed in 1889 as to the out-of-the-city toll service. It is only one more toll station, or service, in addition to what the defendant company already possessed. It makes no difference that it was located in Chicago and not in one of the seven counties in which defendant had toll station service. Why should such a connection cost $50 per year more than any new toll station since established in an adjoining county? The charges for the service rendered after the connection is made are paid in both instances by the subscriber using the connection."

The chancellor, then, after discussing and reviewing at length the Indiana decisions above cited, says:

"The Indiana Supreme Court properly held that a telephone company by no special device or pretense of improved, better or different appliances or service, could evade its duty to rent telephones and give telephone service at the rate prescribed by the statute; that the limitation of the law was not, as to the telephone service, in force at the time of its passage, but applied to all the telephone service at any time thereafter that might be furnished to subscribers."

As against the Indiana decisions, which appellant's counsel claim to be irrelevant, they cite and rely on the recent case of Chesapeake & Potomac Tel. Co. v. Manning, 186 U. S. 238, which we have carefully read. The decision is by a divided court, four judges to three, two judges not sitting, and we think not so nearly analogous to this case as are the Indiana decisions. The principle underlying the latter cases, namely, that as to public service corporations the laws should be construed favorably to the public and strictly as to the corporations, appeals to our reason and conforms to our views as to what is a proper administration of justice.

We agree with the learned chancellor's conclusion, though it is perhaps somewhat broader than the holding of the Indiana court. From this conclusion it follows, as we think, that the defendant, to the extent of its ability, is bound to furnish to any person applying therefor, within the district in question, telephone service with all the improvements thereon, which the defendant had adopted and had in use within that district at the time of the filing of the bill—that is, said metallic circuit service—at the ordinance rate of $125 per annum. Whether the combined service, as it is called, which the defendant agreed to furnish under its contracts with complainants, namely, connections with the long distance systems of another corporation, The American Telephone Co., should be required to be furnished as a part of said metallic circuit service, is not, in our opinion, of special importance on this interlocutory appeal and under the evidence here presented. As we understand the evidence, the metallic circuit service, within the district in question, with the equipment, instruments and appliances now in use by defendant for that service, can not be given to complainants without at the same time giving them connections with the local toll service and the long distance system, that is, connections with that toll service and system which would enable complainants, on the payment of extra tolls, to have the benefit thereof. It could, therefore, be no advantage to defendant to have the injunction now modi-

fied so as to permit it to refuse to furnish connections with the long distance system, which is a necessary part of the metallic circuit service as now arranged and used by defendant. If on the final hearing evidence should be submitted from which it should be made to appear unjust or inequitable to enforce complainants' contracts, after striking out the excess of $50 over the ordinance rates from the amount agreed to be paid annually, and it should also be shown that the defendant can furnish the metallic circuit service with equipment, instruments and appliances, and make it an efficient and satisfactory telephone service within the district in question, and include the local toll service, without at the same time making connections with the long distance service, no doubt the chancellor would modify the injunction accordingly, and by the final decree only so far enforce complainants' contracts as will give them the metallic circuit service within said district; and the local toll service, without the long distance connections.

In view of the conclusions expressed, it seems unnecessary to discuss other claims made and very ably argued by appellant's counsel; suffice it to say, they have all been fully considered, and, in our opinion, can not be maintained.

The injunction order of the Circuit Court is affirmed.